# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 28, 2007 — Decided June 26, 2007

No. 05-7157

CHRISTOPHER G. PITT, SR. AND
TELA HANSOM-PITT,
APPELLANTS

v.

DISTRICT OF COLUMBIA, ET AL.,
APPELLEES

Consolidated with
05-7163 and 06-7009

Appeals from the United States District Court
for the District of Columbia
(No. 01cv02225)

*William J. Mertens* argued the cause for appellants/cross-appellees. With him on the briefs was *L. Barrett Boss*.

*Carl J. Schifferle*, Assistant Attorney General, Office of Attorney General for the District of Columbia, argued the cause for appellees/cross-appellants. With him on the briefs were *Linda Singer*, Attorney General, *Todd S. Kim*, Solicitor General, and *Edward E. Schwab*, Deputy Solicitor General.

Before: SENTELLE, HENDERSON and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

SENTELLE, *Circuit Judge*:  The events giving rise to this case are troubling.  After a violent robbery, the police arrested the wrong person – plaintiff Christopher Pitt – then initiated criminal proceedings against Mr. Pitt despite overwhelming evidence of his innocence.  Mr. Pitt and his wife subsequently brought suit against the District of Columbia and three individual police officers, seeking relief under federal law and D.C. common law for malicious prosecution, false arrest, and intentional infliction of emotional distress.  After trial, the jury returned a split verdict and the district court entered judgment for the plaintiffs for $153,000.  The defendants then moved for judgment as a matter of law on all claims, which the district court granted in part and denied in part.  On appeal both sides challenge the district court's rulings on the motions for judgment as a matter of law.  We affirm in part, reverse in part, and remand to the district court for further proceedings.

## I.

### A.

At approximately 12:00 p.m. on January 2, 2001, two senior citizens – Henry and Gloria Feldman – were violently robbed in their apartment building in Northwest Washington.  The robber had followed the Feldmans into their building and then into the elevator.  In the hallway outside the Feldmans' apartment, the robber "socked" Mr. Feldman in the face and took his wallet, then grabbed Mrs. Feldman's purse before escaping down a nearby staircase.  The Feldmans immediately called 911.  During the 911 call, Mrs. Feldman described the robber as a black man around 5'8" tall with a medium complexion and dark

hair, who was wearing a black leather jacket and a "beige-y" shirt.  She told the operator that the perpetrator had not used a weapon during the robbery.

Meanwhile, Keith Dade, an employee of the apartment building, was notified of the robbery and saw the perpetrator leaving the building.  Mr. Dade followed the man and attempted to ask him a few questions, but the robber told Mr. Dade to "back up" and started to run away.  Mr. Dade saw the robber make a suspicious "gesture" as though he might have had a weapon, but did not actually see a weapon.  After following the perpetrator out of the building and across the street, Mr. Dade lost sight of him.  Mr. Dade gave a description of the robber to the police, who subsequently broadcast a lookout alert to officers in the area.

Responding to the lookout alert, Officers Bryan Adams and Steven Baxter arrived at the intersection where Mr. Dade last saw the perpetrator.  After conferring with other officers at the scene, Officer Adams looked down the street and saw an individual who matched the description of the perpetrator get into a car and begin driving toward Rock Creek Park.  The individual spotted by Officer Adams was the plaintiff, Christopher Pitt.  Officers Adams and Baxter returned to their vehicle and followed plaintiff through Rock Creek Park and onto Calvert Street before pulling him over on the Taft Bridge on Connecticut Avenue.  During the officers' pursuit, plaintiff failed to fully stop at some of the stop signs, but he was not speeding.  After stopping the plaintiff, the officers told him that he was a suspect in a robbery, asked him to step out of the vehicle, and handcuffed him for their protection.  The officers confirmed that plaintiff's clothes and physical characteristics matched the description of the robber.  Plaintiff permitted the officers to search his vehicle, and during this search they found a hunting knife and a BB gun.  Mr. Pitt informed the officers

that he worked as a courier, and that the knife and BB gun were for his protection. Plaintiff also provided the police with a list of the pickups and deliveries he had made that day, as well as two receipts for recent deliveries to the embassies of Kuwait and Qatar.

After being notified that a suspect had been apprehended, other police officers brought the Feldmans and Mr. Dade to the Taft Bridge for a "show-up" identification to determine whether any of the eyewitnesses could identify plaintiff as the robber. Mrs. Feldman told the officers she got a "good look" at the robber, and that she was "certain" plaintiff was not the person who had robbed them. Mr. Feldman told the police he "wasn't sure" whether plaintiff was the perpetrator, but that he "doesn't think so." Mr. Dade thought plaintiff looked somewhat like the robber, but he "couldn't make a positive ID" because the plaintiff's hair was "longer and curlier" than the robber's, and the plaintiff – unlike the robber – was wearing a hat.

Lieutenant Josiah Eaves was at the Feldmans' apartment building reviewing the building's security videotapes when he heard over the radio that a suspect had been arrested. Surveillance cameras had captured the robber's image as he entered the building behind the Feldmans. Lt. Eaves went to the Taft Bridge to determine whether plaintiff was the person seen on the tapes. Lt. Eaves told the officers on the scene that he was confident plaintiff was the robber.

While the show-up identification was being conducted, two other officers – Detectives Sean Caine and James Bovino – conducted a brief investigation of plaintiff's alibi that he was making deliveries at a nearby embassy at the time of the robbery. The two detectives questioned a guard at the Kuwaiti Embassy about whether plaintiff had been there earlier that day, but the details of this interaction are disputed. Detective Caine

testified at trial that the guard told him that "he hasn't seen Chris today." However, the embassy guard testified that he told the officers that a "Chris" had been at the embassy on the day of the robbery.

After the show-up, Mr. Pitt was arrested and taken into custody. The next day, Officers Adams and Baxter presented the case to screening prosecutors from the U.S. Attorney's Office. Officer Adams gave the prosecutors an affidavit that contained a detailed description of the robbery, but did not mention the negative identifications or Mr. Pitt's alibi. It is disputed whether the officers' handwritten notes – which did describe the negative identification and alibi – were given to the screening prosecutors along with the affidavit. The affidavit also stated that a cell phone ear piece cover was found at the scene of the robbery, and that Mr. Pitt's cell phone ear piece was "missing its cover."

Based on the information contained in this affidavit, on January 3, 2001, a Superior Court Magistrate Judge ordered Mr. Pitt committed to a halfway house. Mr. Pitt spent ten days incarcerated before being released on January 13, 2001. Six days later, the government dismissed the criminal case against Mr. Pitt.

**B.**

On October 29, 2001, Christopher Pitt and his wife Tela Hansom-Pitt ("plaintiffs") brought suit in U.S. District Court against the District of Columbia, Officer Bryan Adams, Officer Steven Baxter, and Detective James Bovino. In their complaint, plaintiffs sought relief under 42 U.S.C. § 1983 for false arrest and malicious prosecution, and under D.C. common law for false arrest, malicious prosecution, intentional infliction of emotional distress, and loss of consortium. Plaintiffs argued in

district court that the defendants committed a laundry list of tortious acts, including: (1) arresting Mr. Pitt and initiating criminal proceedings against him even though at least two eyewitnesses stated that he was not the robber; (2) arresting and prosecuting Mr. Pitt even though he was clearly not the person seen on the apartment building's security videotape; (3) ignoring the fact that Mr. Pitt could not have been the robber because he was making a delivery at a nearby embassy at the time the robbery took place; and (4) submitting an affidavit to the U.S. Attorney's Office that contained numerous misstatements and omissions about the details of the robbery.  As a result of this conduct, plaintiffs contended that Mr. Pitt was wrongfully incarcerated for ten days, was subjected to a strip-search and body cavity search, lost his job, and suffered emotional distress.

After an eight-day jury trial, the defendants moved for judgment as a matter of law on all of the plaintiffs' claims.  The district court granted the defendants' motion with respect to the § 1983 malicious prosecution claim, holding that there was not a "clearly established" constitutional right to be free from malicious prosecution, and thus the defendant officers were entitled to qualified immunity on this claim.  With respect to the rest of the plaintiffs' claims, the district court denied the motion and sent the claims to the jury.

The jury found all three officers liable for false arrest under § 1983.  However, the jury returned a defense verdict for the three officers and the District on the common law false arrest claims – on the special verdict form, the jurors found that the officers lacked probable cause to arrest Mr. Pitt, but that they were not liable for common law false arrest because they "reasonably and in good faith" believed that their conduct was lawful.  On the common law malicious prosecution claims, the jury returned a plaintiff's verdict against the District and all three officers.  With respect to the common law intentional

infliction of emotional distress claims, the jury found the District liable but the three officers not liable. The jury awarded $100,000 to Mr. Pitt and $50,000 to Ms. Hansom-Pitt as compensatory damages, and assessed $1,000 in punitive damages against each officer.

After the verdict was received, the defendants renewed their motion for judgment as a matter of law. In a memorandum opinion and order, the district court granted the defendants' motion with respect to the § 1983 false arrest claims, holding that the three officers were entitled to qualified immunity. In reaching this conclusion, the district court relied in part upon the jury verdict on the common law claims, in which the jury found that the officers were not liable for false arrest because they had a reasonable good faith belief that their conduct was lawful. The district court denied the defendants' motion for judgment as a matter of law on the common law malicious prosecution claims and intentional infliction of emotional distress claims, and refused to set aside the punitive damages award. Both sides now appeal the district court's rulings on the defendants' motion for judgment as a matter of law.

\* \* \*

In Section II, we address the arguments raised by the District and the three officers. The defendants argue that there was insufficient evidence to hold all four defendants liable for common law malicious prosecution, and to hold the District liable for intentional infliction of emotional distress. Defendants also argue that the evidence was insufficient to support an award of punitive damages against the three officers. We reverse the district court's denial of the defendants' motion for judgment as a matter of law with respect to Ms. Hansom-Pitt's intentional infliction of emotional distress claim. We also hold that there was insufficient evidence to find Detective Bovino liable for

malicious prosecution, and thus we reverse the district court on this issue. However, we affirm the district court's denial of the defendants' motion for judgment as a matter of law on each of the other common law claims. We affirm the award of $1,000 in punitive damages against Officers Adams and Baxter, but we set aside the punitive damage award against Detective Bovino.

In Section III, we address the arguments raised on appeal by the plaintiffs. Plaintiffs argue that the district court erred by holding that the three defendant officers were entitled to qualified immunity on the false arrest and malicious prosecution claims brought under 42 U.S.C. § 1983. We affirm the district court with respect to the malicious prosecution claims, but we reverse and remand on the false arrest claims.

## II.

### A. *Common Law Malicious Prosecution Claims*

To reiterate, after trial, the jury returned a verdict in favor of the plaintiff against the District and each of the three officers on the common law malicious prosecution claims. The defendants moved for judgment as a matter of law, but the district court denied the motion. Defendants now appeal, arguing that the evidence received at trial was insufficient to support the jury's verdict for the plaintiff on the malicious prosecution claims. We affirm the district court's denial of the defendants' motion for judgment as a matter of law with respect to the District and Officers Adams and Baxter, but we reverse with respect to Detective Bovino.

Under District of Columbia law, there are four elements to the tort of malicious prosecution: (1) termination of the underlying suit in plaintiff's favor; (2) malice on the part of the defendant; (3) lack of probable cause for the underlying suit; and

(4) special injury occasioned by plaintiff as a result of the original action. *Morowitz v. Marvel*, 423 A.2d 196, 198 (D.C. 1980). The first and fourth elements are not contested on appeal, and thus we address only the issues of probable cause and malice.

\* \* \*

To support an action for malicious prosecution in the District of Columbia, the plaintiff must show that "the original action was instituted . . . without probable cause." *Ammerman v. Newman,* 384 A.2d 637, 639 (D.C. 1978). In a civil action for malicious prosecution, probable cause is defined as the existence of "facts and circumstances as will warrant a cautious man in the belief that his action and the means taken in prosecuting it are legally just and proper." *Id.* at 639-40. The issue in a malicious prosecution case is not whether there was probable cause for the initial arrest, but whether there was probable cause for the "underlying suit." *Joeckel v. Disabled Am. Veterans*, 793 A.2d 1279, 1282 (D.C. 2002). The existence of probable cause is a mixed question of law and fact. *Smith v. Tucker*, 304 A.2d 303, 306 (D.C. 1973). "The existence of the facts [is] for the jury, but their effect when found is a question for the determination of the court." *Id.* (citations omitted). Given that the jury has found all four defendants liable for common law malicious prosecution, we must view all disputed evidence in the light most favorable to the plaintiff and "resolve [] all conflicts in [plaintiff's] favor." *Scott v. District of Columbia*, 101 F.3d 748, 752-53 (D.C. Cir. 1996).

In this case, we agree with the district court's conclusion that the defendants initiated criminal proceedings against Mr. Pitt without probable cause. Most importantly, both victims of the crime told the police that Mr. Pitt was not the person who had robbed them. The perpetrator followed the Feldmans into

the apartment building, then rode the elevator with them up to the eighth floor before committing the robbery. Mrs. Feldman got a "good look" at the robber while waiting for the elevator, while getting off the elevator, and during the robbery. After having observed the robber at close range, she told the police "right away" that Mr. Pitt was not the perpetrator, and that she was "very certain" of her identification. More specifically, she "knew right away from the shape of his head and his physique that it was not him." Mrs. Feldman's negative identification was unqualified, and she emphasized that "I won't forget that guy's face." Mr. Feldman did not see the perpetrator as clearly as Mrs. Feldman, but he also had doubts about whether Mr. Pitt was the robber. He told the police that he "wasn't sure, 50/50, but I don't think so." Mr. Feldman also described his identification as "more on the negative side than on the positive side." In sum, *both* victims of the crime provided negative identifications of Mr. Pitt – Mrs. Feldman told the police she was "certain" that Mr. Pitt was not the robber, and Mr. Feldman stated that he "didn't think so."

Why the police chose to initiate criminal proceedings against Mr. Pitt despite negative identifications by the victims of the crime is somewhat baffling. As we have noted in previous cases, show-up identifications are often problematic because they are inherently suggestive. *See, e.g., United States v. Rattler*, 475 F.3d 408, 413 (D.C. Cir. 2007). The fact that both victims provided negative identifications of Mr. Pitt *despite* the inherent suggestiveness of an identification in which only one individual is shown to the eyewitness should have been strong evidence of Mr. Pitt's innocence. Defendants cite several cases for the proposition that one exculpatory fact – such as a negative identification – is insufficient to defeat probable cause. However, those cases involved witnesses' *failure to identify* a suspect rather than an outright negative identification. *See Wilson v. Russo*, 212 F.3d 781, 785, 791-92 (3d Cir. 2000) (one

witness "could not say with certainty" that the robber's picture was included in a photo array); *Olinger v. Larson*, 134 F.3d 1362, 1365-66 (8th Cir. 1998) (witness was unable to identify suspect based on a black-and-white videotape of the robbery). The defendants have not cited a single case – from any jurisdiction – in which a court held that there was probable cause to arrest or prosecute a suspect notwithstanding a victim's unambiguous negative identification of the suspect. Of course, it is likely that no such cases can be found because few law enforcement agencies would arrest or prosecute a suspect after a victim of the crime has stated without qualification that the suspect was not the perpetrator.[1]

Defendants point to several other facts that purportedly supplied probable cause to initiate the prosecution of Mr. Pitt. First, they note that Mr. Pitt's "clothing" and "physical description" matched the description of the robber. However, this fact has little probative value, given that the persons who provided these descriptions – Mr. and Mrs. Feldman – both provided negative identifications of Pitt during the show-up identification. Second, defendants claim that Mr. Pitt left the scene in a direction and manner "consistent with flight." The record does not support this contention. The officers saw Mr. Pitt get into his car and drive away from the scene approximately eight minutes after the robbery had taken place. Had Mr. Pitt been "fleeing" – as the defendants now contend –

---

[1]We can envision a scenario in which there may be probable cause to arrest or prosecute a suspect despite a negative identification from a victim – *i.e.,* if other evidence of the defendant's guilt is overwhelming, or if the witness's negative identification was based on fear or intimidation. However, this is not such an extraordinary case. The other evidence against Mr. Pitt was weak, and Mrs. Feldman testified that she was composed and calm during the show-up and that she was "certain" of her negative identification.

he might well have been gone from the scene much faster than that. Moreover, Officer Adams testified that Mr. Pitt was not speeding, and that he pulled over "voluntarily" as soon as one of the officers instructed him to stop. Based on the evidence in the record, we cannot conclude that Mr. Pitt's actions were "consistent with flight." Third, the police assert that they found "instruments of robbery" – a knife and a BB gun – in Mr. Pitt's car. However, we fail to see the relevance of this evidence, given that the victims did not allege that the robber had used a weapon. And Mr. Pitt provided a reasonable explanation for why he had these items – he was a courier who needed them for his protection. Lastly, defendants contend that Mr. Pitt resembled the images of the robber captured on security videotapes from the Feldmans' apartment building. Before arresting Mr. Pitt, Lt. Eaves watched the tape and concluded that Mr. Pitt was the perpetrator. However, there is a significant factual dispute over how closely Mr. Pitt resembled the person seen on the videotape. Lt. Eaves conceded that when he compared a picture of Mr. Pitt to a still-frame photo from the video during the trial, he had doubts about whether Mr. Pitt was the person seen on the tape. Similarly, in his deposition, Officer Baxter stated that when he viewed the tape, he "couldn't make a positive determination" of whether Mr. Pitt was the robber. We have independently reviewed a still-frame scene from the video, and we see several significant differences between the perpetrator and Mr. Pitt – most notably, the perpetrator clearly had a receding hairline, while Mr. Pitt has a full head of hair, and the perpetrator appears stockier than Mr. Pitt. Drawing all reasonable inferences in favor of the plaintiff, the video is at least ambiguous, and might even be a significant piece of exculpatory evidence.

Overall, in light of the negative identifications of Mr. Pitt by the victims of the crime, we do not believe that any of the aforementioned facts were probative enough to provide probable

cause to initiate criminal proceedings against Mr. Pitt.

\* \* \*

Defendants also contend that the evidence offered at trial was insufficient to establish malice. The determination of malice is "exclusively for the factfinder," and "the requisite malice can be established from the existence of a willful, wanton, reckless, or oppressive disregard for the rights of the plaintiff." *Tyler v. Cent. Charge Serv., Inc.*, 444 A.2d 965, 969 (D.C. 1982).

Here, a reasonable jury could have concluded that Officers Adams and Baxter acted with malice because the arrest report and the affidavit submitted to prosecutors contained several material misstatements and omissions. Most significantly, the affidavit – which was signed by Officer Adams and largely copied from the arrest report prepared by Officer Baxter – contained absolutely no mention of the Feldmans' negative identifications. The affidavit contained minute details about the robbery and about the stop of Mr. Pitt's car, but it completely omitted the fact that *neither* victim of the crime believed that Mr. Pitt was the perpetrator. Defendants assert that the officers' notes – which did describe the show-up identification with the Feldmans – were included in the "jacket" of the case file that was submitted to prosecutors from the U.S. Attorney's Office. However, during his deposition, Officer Baxter testified that he did not recognize the notes, and that he did not know whether the notes had been given to the screening prosecutors. Similarly, AUSA Richard Tischner testified that "very many times," the officers' notes are not included in the case jackets. At the very least, there is a factual dispute over whether the prosecutors actually received these notes, and given that the jury returned a plaintiff's verdict on the malicious prosecution claims, we must resolve this factual question in favor of the

plaintiff.

The affidavit also contained at least one statement that was unambiguously false.  According to the affidavit, an officer observed Mr. Pitt getting into a car "within seconds" after a building employee saw the robber leave the building.  However, Officer Adams testified that approximately ten minutes had passed from the time the building employee lost sight of the perpetrator until the officers saw Mr. Pitt.  The affidavit gave the false impression that the police were hot on the trail of the robber when they observed Mr. Pitt getting into his car.  On the evidence, the perpetrator had been gone for at least eight minutes by the time the police spotted Mr. Pitt in the area.  In sum, we agree with the district court that a reasonable jury could have concluded that Officers Adams and Baxter acted with malice in initiating criminal proceedings against Mr. Pitt.

Officers Adams and Baxter argue that they are protected from liability for malicious prosecution because they acted in reliance upon the advice of counsel – namely, the prosecutors in the U.S. Attorney's Office.  "Proof that a person who institutes a criminal proceeding placed the facts fully and fairly before counsel and acted upon his advice is a good defense to the charge of want of probable cause." *Jarett v. Walker*, 201 A.2d 523, 526 (D.C. 1964).  The burden of proof is on the defendant to show by a preponderance of the evidence that he is entitled to an affirmative defense. *Cf. District of Columbia v. Sterling*, 578 A.2d 1163, 1165 (D.C. 1990) (holding that defendants bear the burden of proving contributory negligence by a preponderance of the evidence).  Here, defendants have not met their burden of establishing that they are entitled to the "advice of counsel" defense.  AUSA Richard Tischner typed portions of the officers' arrest report, but Mr. Tischner testified that the facts contained in the report were based solely upon "what the police officers have to tell us."  AUSA Tischner also testified that "every word"

of a report is read back to the officer in order to ensure that it is truthful and accurate. Moreover, the "advice of counsel" defense only protects defendants who "place[] the facts fully and fairly before counsel." *Jarrett*, 201 A.2d at 526. As explained above, there was evidence that the officers failed to tell prosecutors several key facts regarding the arrest and show-up identification. In light of the omissions and misstatements in the affidavit prepared by the defendant officers, we cannot conclude that the facts of the case were placed "fully and fairly" before the Assistant U.S. Attorneys. Accordingly, we hold that Officers Adams and Baxter are not entitled to the "advice of counsel" defense, and we affirm the district court's denial of their motion for judgment as a matter of law on the common law malicious prosecution claims.

* * *

Although we affirm with respect to Officers Adams and Baxter, we reverse the district court's denial of the defendants' motion for judgment as a matter of law with respect to Detective Bovino. There is no evidence in the record that Det. Bovino had any role in initiating criminal proceedings against Mr. Pitt. Det. Bovino did participate in the investigation of the robbery – he took statements from eyewitnesses, watched the security videotape, and investigated Mr. Pitt's alibi. However, these facts are insufficient to establish that Det. Bovino was "responsible for the institution of the malicious proceedings." *Malicious Prosecution*, 52 AM. JUR. 2d § 21, at 154-55 (2000); *see also Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004) (noting that malicious prosecution actions may only be brought against "persons who have wrongfully caused the charges to be filed"). Police officers who "sign and swear to a criminal complaint on which the public authorities base their prosecution of the plaintiff" may be liable. 52 AM. JUR. 2d § 22, at 155. For example, Officer Adams – who signed the false and

misleading affidavit upon which the prosecution was based – could be held liable for malicious prosecution.  But there is no evidence in the record that Det. Bovino had any involvement in this case beyond routine investigatory duties.  He did not prepare or sign the arrest report or the affidavit that was presented to the prosecutors, and he did not speak to the screening attorneys in the U.S. Attorney's Office.  In sum, based on the evidence received at trial, no reasonable jury could find Det. Bovino liable for malicious prosecution.  Thus, we reverse the district court on this issue and remand with instructions to enter judgment for Detective Bovino on the common law malicious prosecution claims.

## B. *Intentional Infliction of Emotional Distress Claims*

On the intentional infliction of emotional distress ("IIED") claims, the jury returned a defense verdict for each of the three police officers.  However, the jury returned a verdict for the plaintiffs – both Christopher Pitt and Tela Hansom-Pitt – against the District.  The District moved for judgment as a matter of law on these claims, but the district court denied the motion.  The District now appeals.  We affirm the district court's denial of the District's motion for judgment as a matter of law with respect to Mr. Pitt's IIED claim, but we reverse with respect to Ms. Hansom-Pitt's claim.

Under District of Columbia tort law, a plaintiff seeking relief for IIED must offer proof of "extreme or outrageous conduct" that intentionally or recklessly causes the plaintiff to suffer "severe emotional distress." *Joyner v. Sibley Mem. Hosp.*, 826 A.2d 362, 373 (D.C. 2003) (quoting *Kerrigan v. Britches of Georgetowne*, 705 A.2d 624, 628 (D.C. 1997)).  The only issue on appeal is whether a reasonable jury could have found the District's conduct to be "extreme and outrageous."  To establish "outrageousness," the plaintiff must prove that the defendant's

conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* Given that the jury found the District liable for IIED, we must allow the verdict to stand "unless the evidence, together with all inferences that can be reasonably drawn therefrom is so one-sided [in favor of the moving party] that reasonable men could not disagree on the verdict." *Milone v. Wash. Met. Area Transit Auth.*, 91 F.3d 229, 231 (D.C. Cir. 1996) (internal quotation marks and citation omitted).

Here, a reasonable jury could have returned a verdict for Mr. Pitt on his IIED claim. As explained in the previous section, the plaintiffs offered evidence that the officers' affidavit contained several glaring omissions and at least one false statement. Similarly, the jury could have inferred from the evidence that at least one officer tampered with evidence in an attempt to link Mr. Pitt to the scene of the crime. During their investigation, the police found an "ear piece cover for a cell phone" at the scene of the robbery. In the affidavit that was submitted to prosecutors, Officer Adams stated that Mr. Pitt's "ear piece was missing its cover." Yet Mr. Pitt testified that his cell phone ear piece was "brand new" and that the foam cover was intact when the police seized his phone. From these facts, a reasonable jury could conclude that an officer may have removed the ear piece cover from Mr. Pitt's cell phone in order to link him to the scene of the robbery. Taking the evidence in the light most favorable to the plaintiff, we agree with the district court that a reasonable jury could have found the District's actions sufficiently "outrageous" to support a verdict for Mr. Pitt on his IIED claim.

The District argues that the verdict should be set aside as fatally inconsistent because the jury found the District liable for IIED while finding the individual officers not liable. We reject

the District's arguments. In both the civil and criminal contexts, courts have held that inconsistency alone is not a sufficient basis for setting aside a jury verdict. *See United States v. Dykes,* 406 F.3d 717, 722-23 (D.C. Cir. 2005) (holding that a "criminal defendant convicted by a jury on one count cannot attack that conviction because it was inconsistent with the jury's verdict of acquittal on another count" (citations omitted)); *United States v. Johnson*, 440 F.3d 1286, 1295 (11th Cir. 2006) (holding that "consistent verdicts are unrequired in joint trials for conspiracy: where all but one of the charged conspirators are acquitted, the verdict against the one can stand" (citation omitted)); *Mosley v. Wilson*, 102 F.3d 85, 89-90 (3d Cir. 1996) (holding that it was error for a district court to "enter[] judgment as a matter of law solely on the basis of inconsistent verdicts"). In any event, the verdicts here are not necessarily inconsistent. The jury found each individual officer not liable, which means that the jury could not conclude by a preponderance of the evidence that any individual officer was liable for IIED. However, at the same time, the jury could have reasonably concluded that the group of police officers as a whole acted sufficiently "outrageously" or "recklessly" that the District should be liable. As explained above, several different officers were involved in Mr. Pitt's arrest and prosecution, and a reasonable jury could have concluded that the department as a whole was liable, even if the evidence was insufficient to impose IIED liability on any individual officer.

\* \* \*

Although we affirm the district court with respect to Mr. Pitt's IIED claim, we reverse the district court's denial of the District's motion for judgment as a matter of law on Ms. Hansom-Pitt's IIED claim. The District of Columbia has adopted the standard for intentional infliction of emotional distress from the Restatement (Second) of Torts. *See Sere v.*

*Group Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C. 1982) (quoting Restatement for the elements of IIED); *Abourezk v. N.Y. Airlines, Inc.*, 895 F.2d 1456, 1459 (D.C. Cir. 1990) (per curiam) (same).  Section 46 of the Restatement states:

> Where such [extreme and outrageous] conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress . . . to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm.

RESTATEMENT (SECOND) OF TORTS § 46(2) (1965).  Thus, under D.C. tort law, a family member can only recover for IIED if she was "present" when the extreme or outrageous conduct took place.

As explained above, the "extreme or outrageous" conduct in this case was the filing of a false and misleading affidavit and possible evidence tampering.  Based on the evidence in the record, it appears that the affidavit was prepared at the police station and then presented to prosecutors from the U.S. Attorney's Office.  It cannot be said that Ms. Hansom-Pitt was "present at the time" of this conduct.  In common parlance, the word "present" connotes physical proximity.  *See* WEBSTER'S NEW INTERNATIONAL DICTIONARY 1793 (3d ed. 1961) (defining "present" as "being in one place and not elsewhere; being within reach, sight or call or within contemplated limits; being in view or at hand").  We cannot hold that Ms. Hansom-Pitt was in any way physically "present" at the location where this affidavit was prepared or filed.  Were we to allow Ms. Hansom-Pitt to recover for IIED, we would be substantially expanding the scope of the third-party IIED tort under District of Columbia law.  Of course, in considering common law claims, federal courts must apply existing law – we have no power to alter or expand the scope of

D.C. tort law. *See Tidler v. Eli Lilly & Co.*, 851 F.2d 418, 424 (D.C. Cir. 1988) (noting that a federal court adjudicating state law claims "is not free to engraft onto those state rules exceptions or modifications which may commend themselves to the federal court, but which have not commended themselves to the State in which the federal court sits" (quoting *Day & Zimmerman v. Challoner*, 423 U.S. 3, 4 (1975)). Accordingly, we reverse the district court and remand with instructions to enter judgment for the District on Ms. Hansom-Pitt's IIED claim.

## C. *Punitive Damages*

The jury assessed $1,000 in punitive damages against each of the three defendant officers. The defendants moved to set aside the punitive damages, arguing that the evidence offered at trial did not show that the officers' conduct was "outrageous or egregious." The district court denied the motion. We affirm with respect to Officers Adams and Baxter but set aside the punitive damage award against Detective Bovino.

Under District of Columbia law, "[p]unitive damages are warranted only when the defendant commits a tortious act accompanied with fraud, ill will, recklessness, wantonness, oppressiveness, wilful disregard of the plaintiff's right, or other circumstances tending to aggravate the injury." *Butera v. District of Columbia*, 235 F.3d 637, 657 (D.C. Cir. 2001) (quoting *Jonathan Woodner Co. v. Breeden*, 665 A.2d 929, 938 (D.C. 1995)). In order to impose punitive damages, the jury must find by clear and convincing evidence that the tortious act "was accompanied by conduct and a state of mind evincing malice or its equivalent." *Id.* The jury may "infer the requisite state of mind from the surrounding circumstances." *Id.* (quoting *Jemison v. Nat'l Baptist Convention*, 720 A.2d 275, 285-86 (D.C. 1998)).

In the instant case, a reasonable jury could have concluded that Officers Adams and Baxter acted with "recklessness" or "wilful disregard" of Mr. Pitt's rights. As explained in greater detail above, there was evidence that these two officers: (1) initiated criminal proceedings against Mr. Pitt despite negative identifications from the two victims; (2) omitted the negative identifications from the arrest report and an affidavit submitted to prosecutors; and (3) falsely stated in the arrest report and affidavit that they saw Mr. Pitt get into his car "within seconds" after a building employee saw the robber leaving the apartment building. Based on these facts, a reasonable jury could find by clear and convincing evidence that Officers Adams and Baxter acted recklessly or with wilful disregard of Mr. Pitt's rights. Accordingly, we affirm the jury's award of $1,000 punitive damages against these two defendants.

However, we set aside the award of punitive damages against Detective Bovino. As explained above, the evidence offered at trial was insufficient to find Det. Bovino liable for malicious prosecution. There was no evidence that Det. Bovino was responsible for the prosecution of Mr. Pitt. He did not prepare the arrest report or the affidavit, and he did not present the case to screening prosecutors. And there was no evidence that any of his notes from the investigation were false or misleading. It cannot be said that Det. Bovino acted with "malice," "recklessness," or "wilful disregard" of Mr. Pitt's rights. Thus, we set aside the $1,000 punitive damage award against Detective Bovino.

## III.

### A. *False Arrest Claims Under 42 U.S.C. § 1983*

Plaintiffs argue that the district court erred in holding that the defendants were entitled to qualified immunity on the claims

for false arrest under 42 U.S.C. § 1983. After trial, the jury found the three individual officers liable for false arrest under § 1983, but not liable for common law false arrest. The defendants then moved for judgment as a matter of law on the § 1983 false arrest claims. The district court granted the motion, holding that the officers were entitled to qualified immunity on these claims. The court noted that even though a reasonable jury could have concluded that plaintiff was arrested without probable cause, the defendants were nonetheless entitled to qualified immunity. The jury had found that the defendants were not liable for common law false arrest because they had a reasonable, good faith belief that their conduct was lawful. Thus, the court concluded that if the qualified immunity question had been presented to the jury, "the jury necessarily would have accepted the defendants' qualified immunity defense." The district court noted that qualified immunity depends on a standard of "objective reasonableness" rather than "subjective good faith," but nonetheless held that the qualified immunity inquiry was "logically guided" by the jury verdict on the common law false arrest claims. Thus, the court granted the defendants' motion for judgment as a matter of law on the § 1983 false arrest claims. We hold that the district court erred by considering the jury verdict from the common law false arrest claims in its qualified immunity analysis.

\* \* \*

The Supreme Court has held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Wilson v. Layne*, 526 U.S. 603, 614 (1999) (holding that qualified immunity turns upon the "objective legal reasonableness of the officers' action,

assessed in light of the legal rules that were clearly established at the time the action was taken" (internal quotation marks and citation omitted)).

Courts have emphasized that whether a § 1983 defendant's conduct violates the "clearly established" constitutional rights of the plaintiff is a pure question of law that must be resolved by the court. In *Hunter v. Bryant*, the plaintiff asserted that he had been arrested without probable cause in violation of the Fourth Amendment, but the defendant Secret Service agents argued that they were entitled to qualified immunity. 502 U.S. 224, 224-27 (1991) (per curiam). The Ninth Circuit held that the trier of fact must determine whether a reasonable officer could have believed he had probable cause to make an arrest, but the Supreme Court reversed. The Court held that the question of qualified immunity "ordinarily should be decided by the court long before trial," and that the Ninth Circuit erroneously "place[d] the question of immunity in the hands of the jury." *Id.* at 228. Similarly, as the Fourth Circuit cogently explained:

> [A]lthough the jury may be suited for making factual findings relevant to the question of qualified immunity, we believe it far better for the court, not the jury, to answer the ultimate legal question of whether a defendant is entitled to qualified immunity. The nature of the analysis – requiring an examination of current federal law and federal law as it existed at the time of the alleged violation – makes for an awkward determination by the jury, at best.

*Knussman v. Maryland*, 272 F.3d 625, 634 (4th Cir. 2001) (internal citation omitted). *See also Phillips v. Hust*, 477 F.3d 1070, 1079 (9th Cir. 2007) ("Whether the right at issue in a claim of qualified immunity is clearly established . . . is a pure question of law . . . ."); *Williams v. Ala. State Univ.*, 102 F.3d 1179, 1182 (11th Cir. 1997) (same); *Warren v. Dwyer*, 906 F.2d

70, 76 (2d Cir. 1990) ("The ultimate legal determination whether, on the facts found, a reasonable police officer should have known he acted unlawfully is a question of law better left for the court to decide.").

We reverse the district court's order insofar as it grants the defendants' motion for judgment as a matter of law on the plaintiff's claim for arrest without probable cause under § 1983. In this case, the district court erred by considering the jury verdict from the common law false arrest claims in its qualified immunity analysis. As explained above, whether a right is "clearly established" – that is, whether an objectively reasonable officer would have believed his conduct to be lawful, in light of clearly established law – is a question of law that must be resolved by the court, not the jury. We reverse the district court on this issue and remand for a determination of whether the defendants are entitled to qualified immunity on the § 1983 false arrest claims. *See Harlow*, 457 U.S. at 820 (remanding to district court for consideration of a qualified immunity issue because "[t]he trial court is more familiar with the record so far developed and also is better situated to make any such further findings as may be necessary"). On remand, the district court must determine whether the three officers' actions in arresting Mr. Pitt "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818.

## B. *Malicious Prosecution Claims Under 42 U.S.C. § 1983*

Plaintiffs also sought relief for malicious prosecution under 42 U.S.C. § 1983, asserting that the defendants deprived plaintiffs of their constitutional rights by initiating criminal proceedings against Mr. Pitt without probable cause. After trial, the district court granted judgment as a matter of law to the defendants on these claims. The court held that it is not "clearly

established" that malicious prosecution is a violation of constitutional rights, and thus the defendants are entitled to qualified immunity. We affirm.

Section 1983 creates a cause of action to remedy certain deprivations of federal rights, but it is not a source of substantive rights. *See Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979) (noting that "[section 1983] is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes"). To determine whether a given right may be enforced through section 1983, we must look to the underlying constitutional provision that the plaintiff seeks to enforce. Here, the plaintiff asserts that the defendant officers initiated a criminal prosecution against Mr. Pitt without probable cause, in violation of his rights under the Fourth Amendment.[2]

This court has not yet addressed whether malicious prosecution can give rise to a violation of the Fourth Amendment. However, nearly every other Circuit has held that malicious prosecution is actionable under the Fourth Amendment to the extent that the defendant's actions cause the plaintiff to be "seized" without probable cause. *See Britton v. Maloney,* 196 F.3d 24, 28-29 (1st Cir. 1999) (holding that "[f]or a state actor to violate the Fourth Amendment by initiating a

---

[2]Defendants argue that the plaintiffs have only asserted a malicious prosecution claim under the Fifth Amendment's due process clause, not under the Fourth Amendment. We disagree. In their complaint, plaintiffs allege that the defendants violated Mr. Pitt's Fourth Amendment rights by "seizing and detaining him without reasonable articulable suspicion or probable cause." This challenge to his "detention" is sufficiently broad to encompass both the initial arrest as well as his continued incarceration while the criminal case was pending.

malicious prosecution against someone, the criminal charges at issue must have imposed some deprivation of liberty consistent with the concept of a seizure" (citation omitted)); *Singer v. Fulton County Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995) (holding that "[t]he Fourth Amendment right implicated in a malicious prosecution action is the right to be free of unreasonable seizure of the person"); *Gallo v. City of Philadelphia*, 161 F.3d 217, 222 (3d Cir. 1998) (holding that in a malicious prosecution action under the Fourth Amendment, "the constitutional violation is the deprivation of liberty accompanying the prosecution"); *Brooks v. City of Winston-Salem*, *N.C.*, 85 F.3d 178, 183-84 (4th Cir. 1996) (holding that "[a plaintiff's] allegations that [the defendant] seized him pursuant to legal process that was not supported by probable cause and that the criminal proceedings terminated in his favor are sufficient to state a § 1983 malicious prosecution claim alleging a seizure that was violative of the Fourth Amendment"); *Castellano v. Fragozo*, 352 F.3d 939, 953-54 (5th Cir. 2003) (en banc) ("The initiation of criminal charges without probable cause may set in force events that run afoul of explicit constitutional protection–the Fourth Amendment if the accused is seized and arrested, for example . . . ."); *Gregory v. City of Louisville*, 444 F.3d 725, 748 (6th Cir. 2006) (holding that "traditional claims for 'malicious prosecution' [must] be pursued and treated as Fourth Amendment violations when the gravamen of the complaint is continued detention without probable cause"); *Smart v. Bd. of Trustees of Univ. of Ill.,* 34 F.3d 432, 434 (7th Cir. 1994) ("If malicious prosecution . . . is committed by state actors and results in the arrest or other seizure of the defendant, there is an infringement of liberty, but we now know that the defendant's only constitutional remedy is under the Fourth Amendment . . . ."); *Taylor v. Meacham*, 82 F.3d 1556, 1561 (10th Cir. 1996) (noting that "in the § 1983 malicious prosecution context, [the relevant] constitutional right is the Fourth Amendment's right to be free from unreasonable seizures"); *Uboh v. Reno*, 141 F.3d

1000, 1003 (11th Cir. 1998) (holding that malicious prosecution is actionable under § 1983 where "the plaintiff, as part of the commencement of a criminal proceeding, has been unlawfully and forcibly restrained in violation of the Fourth Amendment and injuries, due to that seizure, follow as the prosecution goes ahead" (citation omitted)). To the best of our knowledge, only one circuit has held that malicious prosecution claims do not implicate any constitutional rights. *See Kurtz v. City of Shrewsbury*, 245 F.3d 753, 758 (8th Cir. 2001) (explaining that "this court has uniformly held that malicious prosecution by itself is not punishable under § 1983 because it does not allege a constitutional injury").

We join the large majority of circuits in holding that malicious prosecution is actionable under 42 U.S.C. § 1983 to the extent that the defendant's actions cause the plaintiff to be unreasonably "seized" without probable cause, in violation of the Fourth Amendment. As explained above, given the negative eyewitness identifications and lack of any reliable evidence linking Mr. Pitt to the robbery, there was not probable cause for the officers to initiate criminal proceedings against him. And there is little doubt that the officers' actions effected a "seizure" of Mr. Pitt. Based on the officers' affidavit – which contained several misstatements and omissions – Mr. Pitt was detained in a halfway house for ten days before being released. Accordingly, we hold that the evidence received at trial sufficiently demonstrates that the defendant officers violated Mr. Pitt's Fourth Amendment rights.[3]

---

[3] At first glance, it may appear unnecessary to reach this issue at all, given that – as explained below – we hold that the officers are entitled to qualified immunity on the malicious prosecution claims brought under § 1983. However, the Supreme Court has expressly stated that courts must determine whether a constitutional right has been violated *before* moving to the analysis of whether a right was

\* \* \*

Although prosecution without probable cause can give rise to constitutional injury under the Fourth Amendment, the district court correctly held that the three defendant officers are entitled to qualified immunity on these claims because this right was not "clearly established" at the time of the actions at issue in this case.

Government officials being sued under § 1983 are protected by qualified immunity unless the contours of the right being asserted are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Wilson v. Layne*, 526 U.S. 603, 614-15 (1999). In other words, "in the light of pre-existing law the unlawfulness must be apparent." *Id.* at 615. The Supreme Court has not addressed the precise scope of a malicious prosecution action under § 1983. The Court has held that malicious prosecution does not violate "substantive" due process rights, but it left open the question whether such claims implicate Fourth Amendment rights. *Albright v. Oliver*, 510 U.S. 266, 275 (1994). Earlier this year, the Court once again stated that "[w]e have never explored the contours of a Fourth Amendment malicious-prosecution suit under § 1983, and we do not do so here." *Wallace v. Kato*, 127 S. Ct. 1091,

---

"clearly established" at the time of the defendant's actions. *See County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) ("[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all. Normally, it is only then that a court should ask whether the right allegedly implicated was clearly established at the time of the events in question."). *See also Barham v. Ramsey*, 434 F.3d 565, 572 (D.C. Cir. 2006) (noting that whether the defendant officers have violated a constitutional right of the plaintiff is a "threshold question" in the qualified immunity analysis).

1096 n.2 (2007) (citation omitted).  Similarly, the last time this Court addressed the issue, we noted that "it has not been clearly established that malicious prosecution violates any constitutional or statutory right." *Moore v. Valder*, 65 F.3d 189, 195 (D.C. Cir. 1995).

Based on the aforementioned cases, we hold that at the time of the officers' actions, it had not been "clearly established" in this Circuit that malicious prosecution was a violation of any constitutional rights.  Accordingly, the defendant officers are entitled to qualified immunity on the malicious prosecution claims brought under § 1983.  We affirm the district court's grant of the defendants' motion for judgment as a matter of law on these claims.

## IV.

The district court's orders are affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

*So ordered.*